## THE CALYPSO.

### (District Court, N. D. California, First Division. September 30, 1914.)

### No. 15522.

ALIENS (§ 36*)—OFFENSES AGAINST CHINESE EXCLUSION ACTS—LIABILITY OF VESSEL—"MASTER OF VESSEL."

A gasoline launch was built and owned by two persons, one of whom owned a five-sixths interest. An agreement was signed by both owners of the vessel, providing that the minority owner should make no contracts or debts, or take the vessel out, or hire a crew without a permit from the majority owner. He had previously, however, without the knowledge of the latter, had himself enrolled as master, and a week after the agreement he, with others, and without the knowledge or consent of the other owner, took the vessel and brought a number of Chinese, who were not entitled to enter the United States from Mexico, to a California port, where the vessel was seized under Chinese Exclusion Act May 6, 1882, c. 126, § 10, 22 Stat. 61, as amended by Act July 5, 1884, c. 220, 23 Stat. 115 (Comp. St. 1913, § 4297), which provides that "every vessel whose master shall knowingly violate any of the provisions of this act" shall be forfeited to the United States. *Held*, that such minority owner was not the "master of the vessel," within the meaning of the act, as against the principal owner, and that the interest of the latter was not subject to condemnation thereunder.

[Ed. Note.—For other cases, see Aliens, Dec. Dig. § 36.*

For other definitions, see Words and Phrases, Master of a Ship.]

In Admiralty. Suit by the United States against the gasoline launch Calypso; William L. Sassaman and Morris Pettenger, claimants. Decree for libelant as against the interest of claimant Pettenger alone.

John W. Preston, U. S. Atty., and Walter E. Hettman, Asst. U. S. Atty., both of San Francisco, Cal.

Lloyd, Cheney & Geibel, of Los Angeles, Cal., for claimants.

DOOLING, District Judge. The gasoline screw steamer Calypso was seized in Monterey Bay, while engaged in unlawfully smuggling into this country certain Chinese not entitled to admission. This action is brought to have the vessel condemned in accordance with section 10 of the Chinese Exclusion Act, which is as follows:

"Sec. 10. That every vessel whose master shall knowingly violate any of the provisions of this act shall be deemed forfeited to the United States, and shall be liable to seizure and condemnation in any district of the United States into which such vessel may enter or in which she may be found."

The undisputed facts are as follows:

The Calypso is jointly owned by Wm. L. Sassaman and Morris Pettenger; the former owning a five-sixths and the latter a one-sixth interest. Wm. H. Singleton is a creditor, who is, by agreement with the owners, entitled to a mortgage upon said vessel for $3,400, and the Los Angeles Creamery Company is also a creditor holding mortgages thereon aggregating $760. Sassaman has put into the boat $5,000, and Pettenger $1,000, in addition to the $3,400 secured by Singleton, and about $800 advanced by the Los Angeles Creamery

·Company, making the cost of the boat something over $10,000. On May 22, 1913, Sassaman was regularly enrolled by the collector of the port of Los Angeles as master of the Calypso, and thereafter, with the knowledge and consent of Sassaman, Oren H. Dickason was enrolled as master on July 2, 1913, Ralph L. Lopes on July 15, 1913, and James' H. Castle on September 13, 1913. On November 24, 1913, Pettenger, without the knowledge or consent of Sassaman, procured himself to be enrolled as master in lieu of James H. Castle, and was so enrolled on the ship's papers at the time of the contraband voyage out of which this action arose.

In December of that year certain creditors of Sassaman and Pettenger were pressing for payment, and Sassaman arranged a meeting with them for December 23d, and requested Pettenger to attend. While Sassaman was endeavoring to satisfy the creditors in some way, and, indeed, while he was arranging with Singleton for the indorsement of notes, which finally did satisfy. them, instead of attending this meeting, Pettenger, without Sassaman's knowledge, took the boat from Los Angeles to San Diego, the purpose of his voyage being to secure a load of contraband Chinese to smuggle into the United States; but, as stated by the witnesses, on this voyage "he failed to make connections." After his return from San Diego, and upon December 26, 1913, Pettenger entered into a written agreement with Sassaman as follows:

"Amendment to articles of agreement made August 10, 1912, for the Calypso, between Wm. L. Sassaman and Morris Pettenger, both of Los Angeles, California.

"This ·agreement, made this twenty-third day of December, 1913, in consideration that Wm. H. Singleton agrees to pay promissory notes to the amount of $3,400, which amount clears the indebtedness of the Calypso, I, Wm. L. Sassaman, and I, Morris Pettenger, agree to give said Wm. H. Singleton a mortgage on the Calypso for the amount of $3,400, with interest at 8% and deliver to Wm. H. Singleton the insurance policy, which amounts to $5,-000.00; and, further, that I, Morris Pettenger, agree to make no contracts or take the Calypso out on any trip without a permit from Wm. L. Sassaman, also that I, Morris Pettenger, agree to borrow no money or give any personal note at any time on the Calypso. It is also agreed that I, Morris Pettenger, shall not employ a crew without a permit from Wm. L. Sassaman, and under no circumstances shall the ship's papers be transferred to any one except by Wm. L. Sassaman.                               Wm. L. Sassaman.
                                                        "Morris Pettenger.
"Witnessed by Louise E. Grimaud."

On January 2, 1914, Pettenger, accompanied. by Fred Fox, Will Fox, David Main, and a Chinaman named Lee, took the Calypso out on the trip which resulted in her seizure. They went to Mexico, took on board a number of Chinese, who were not entitled to enter the United States, and about January 16th secretly landed them at Monterey, at which time and place the Calypso was seized by the officers of the United States. The Calypso is therefore liable to condemnation in this proceeding, if Pettenger were her master within the meaning of the law.

The disputed facts that are material are as follows:

Pettenger testified that, about a week after his enrollment as master of the Calypso, he informed Sassaman of the fact of such enrollment,

and that on December 26, 1913, and about an hour after the execution of the agreement above set forth, he had a conversation with Sassaman which he details as follows:

"It was on the 26th of December. I was in the city, and I saw Mr. Sassaman, and I told him that Fox had a proposition on for Mexico, and he wanted — We did not go into the details of it. He wanted to know if there was any money in it. I says, 'Yes.' I had already told him I had signed as master of the ship. There was not anything mentioned at that time whose name was on the ship's papers. I did not tell him what Fox's proposition was. I told him there was a chance proposition, and asked him if he wanted to go down and talk to Fox about it. He says, 'No; you go ahead,' he says, 'and take the boat.' Fox was not employed; he was a partner. Sassaman did not want to go. He proposed I should go. I says, 'Are you willing to put your interest in the boat up against my liberty?' He says, 'Yes; go ahead and use the boat, and get some money in.' "

That he had been informed or had learned that Pettenger was enrolled as master of the Calypso is vigorously denied by Sassaman, as is also the fact that any such conversation occurred as is detailed above. There is no doubt that Pettenger procured his enrollment as master without the knowledge or consent of Sassaman, nor is there any doubt that the agreement by the terms of which Pettenger was not to take the Calypso out on any trip without a permit from Sassaman was executed on December 26th. There is also no doubt that a few days prior thereto, and without the knowledge or consent of Sassaman, Pettenger made the trip to San Diego in an endeavor to secure a load of contraband Chinese, at the very time that Sassaman was endeavoring to arrange a settlement with their creditors. Sassaman is a workingman, long employed by the Los Angeles Creamery Company as a driver and collector, whose hours of work are from midnight until 7 or 8 a. m., and all of whose earnings for a number of years have gone into the Calypso.

The testimony of Pettenger, if true, as to the conversation above set forth, and as to his informing Sassaman of his enrollment as master of the Calypso, is sufficient to establish the fact that he was master, within the meaning of the law, at the time that the vessel was seized. But if Sassaman had no knowledge of Pettenger's enrollment as master, and if after the execution of the agreement of December 26th Pettenger took the Calypso upon the trip which resulted in her seizure, without Sassaman's knowledge or consent, and contrary to the express terms of such agreement, Pettenger, although actually in charge of the Calypso, was not her master in any sense that would authorize the court to condemn Sassaman's interest in her, even though his own interest be subject to condemnation in this proceeding; for Sassaman, having a five-sixths interest in the Calypso, was entitled to name her master and control her movements, and this right he could exercise against the wishes of Pettenger, who owned but a one-sixth interest. The question at issue, then, narrows itself into a question of veracity as between Sassaman and Pettenger. The testimony of Pettenger detailed above was given before the commissioner on April 27th, at which time he testified that the conversation with Sassaman occurred in the barnyard of the Los Angeles Creamery Company, on December 26th, and about an hour after the agree-

ment had been signed. In a deposition sworn to by him in Los Angeles on April 9th he testified. that after signing the agreement and before the Calypso was seized he had not seen Sassaman. Both of these statements cannot be true.

To warrant a decree forfeiting Sassaman's interest in the Calypso, the testimony of Pettenger must be accorded full credit, and that of Sassaman disregarded. But all the circumstances seem to me to corroborate Sassaman rather than Pettenger. Although Sassaman had the absolute right to name the master, Pettenger had without his knowledge or consent procured his own enrollment as such, and had also without Sassaman's knowledge and against his will made the San Diego trip, which had an unlawful purpose in view, and had upon his return signed the agreement that he would not without Sassaman's consent take the boat out, contract any bills, or hire a crew; and I cannot give sufficient credence to his statement that within an hour after the execution of this agreement, made alike for the protection of Sassaman and the creditors, he secured Sassaman's assent to the use of the vessel in an illegal enterprise, to base upon such statement a decree the effect of which might be to deprive an innocent person of the fruits of years of labor.

The finding of the court will be that on the trip in question Pettenger was again acting without the knowledge and against the will of Sassaman, that Sassaman had no knowledge of his enrollment as master, that as against Sassaman he was not such master, within the meaning of the law, and that consequently the interest of Sassaman cannot be condemned.

A decree will be entered condemning the interest of Pettenger only, and such interest will be sold free of incumbrance or lien.